SILVER, J.
[¶ 1] John and Jane Doe, parents of Susan Doe,[1] and the Maine Human Rights *602 Commission appeal from a summary judgment entered in the Superior Court (Pe-nobscot County, Anderson, J.) in favor of Regional School Unit 26 on the Does’ complaint pursuant to the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4592(1), 4602(4) (2013). RSU 26 argues that the public accommodations section of the MHRA conflicts with a statutory provision regarding sanitary facilities in schools, 20-A M.R.S. § 6501 (2013). We are called upon for the first time to interpret the MHRA, and particularly several amendments enacted by the Maine Legislature in 2005, as it applies to transgender students in schools. We vacate the Superior Court’s judgment.
I. BACKGROUND
A. Facts
[¶ 2] The following facts are supported by the summary judgment record, viewed in the light most favorable to the Does and the Commission as the nonprevailing parties. See Trott v. H.D. Goodall Hasp., 2013 ME 33, ¶ 2, 66 A.3d 7.
[¶ 3] Susan Doe is a transgender girl. She was born male, but began to express a female gender identity as early as age two. Beginning in the first grade, she attended Asa Adams School in Orono. Susan generally wore gender-neutral clothing to school until her third-grade year, when her identity as a girl became manifest. At that time, the school principal first became aware that Susan was transgender.
[¶ 4] All third and fourth grade students at Asa Adams used single-stall bathrooms. Susan used the single-stall girls’ bathroom with the support and encouragement of school staff. In third grade, teachers and students began referring to Susan as “she.” By fourth grade, Susan was dressing and appearing exclusively as a girl.
[¶ 5] In early 2007, midway through Susan’s fourth-grade year, school personnel implemented an educational plan, commonly referred to as a “504” plan,[2] to address Susan’s gender identity issues and her upcoming transition to the fifth grade, where students used communal bathrooms separated by sex.[3] The 504 process is generally designed to identify impediments to learning for individual students and to implement steps to help those students succeed in school.[4]
[¶ 6] By the time she was preparing to enter the fifth grade, Susan had received a diagnosis of gender dysphoria, which is the medical term for psychological distress resulting from having a gender identity different from the sex that one was assigned at birth. School officials recognized that it was important to Susan’s psychological health that she live socially as a female. They did not interpret 20-A M.R.S. § 6501, or any other law, as prohibiting a person with Susan’s diagnosis from using the girls’ bathroom.
[¶ 7] A team consisting of Susan’s mother, her teachers, the school guidance *603 counselor, and the director of special services met in March 2007 to develop the 504 plan. The team agreed that school staff should refer to Susan, and encourage students to refer to Susan, by her female name. The school counselor expressed to the group that, for a transgender girl like Susan, using the communal girls’ bathroom was the best practice. The team agreed that requiring Susan to use the boys’ bathroom was not an acceptable option; the principal later testified that it would not have been safe for Susan to do so. The minutes of the 504 meeting reflected the team’s recommendation that Susan use the girls’ bathroom. The minutes also reflected the team’s awareness that a unisex staff bathroom was available for Susan to use in the event that her use of the girls’ bathroom became “an issue.”
[¶ 8] Susan began the fifth grade in September 2007. Her use of the girls’ bathroom went smoothly, with no complaints from other students’ parents, until a male student followed her into the restroom on two separate occasions, claiming that he, too, was entitled to use the girls’ bathroom. The student was acting on instructions from his grandfather, who was his guardian and was strongly opposed to the school’s decision to allow Susan to use the girls’ bathroom. The controversy generated significant media coverage. As a result of the two incidents, the school, over the Does’ objections, terminated Susan’s use of the girls’ bathroom, requiring her instead to use the single-stall, unisex staff bathroom. That year, Susan was the only student instructed to use the staff bathroom.
[¶ 9] The 504 team met again in December 2007 to discuss Susan’s upcoming transition to middle school. Over the Does’ objections, school officials determined that Susan would not be permitted to use the girls’ bathroom at the middle school. Again, Susan was required to use a separate, single-stall bathroom. As a result, at the end of Susan’s sixth-grade year at Orono Middle School, the Doe family moved to another part of the state.
B. Procedural History
[¶ 10] On April 10, 2008, while Susan was still in elementary school, Jane Doe filed a complaint with the Commission alleging that the superintendent and other school district entities[5] violated the MHRA by excluding Susan from the communal girls’ bathroom at Asa Adams. The Commission unanimously found reasonable grounds to believe discrimination had occurred. See 5 M.R.S. § 4612(1)(B) (2013). The Does, as parents and next friends of Susan, and the Commission filed a complaint in the Superior Court on September 23, 2009, asserting claims for unlawful discrimination in education (Count I) and unlawful discrimination in a place of public accommodation (Count II) on the basis of sexual orientation.[6] See 5 M.R.S. § 4612(4)(A) (2013).
[¶ 11] After the Superior Court denied the defendants’ motion to dismiss all counts pursuant to M.R. Civ. P. 12(b)(6), the Does and the Commission filed an amended complaint on May 11, 2011, adding facts to Counts I and II based on Susan’s exclusion from the girls’ bathroom at Orono Middle School. The Superior Court granted RSU 26’s motion for sum *604 mary judgment on all counts on November 20, 2012. See M.R. Civ. P. 56(b). The Does and the Commission appeal the Superior Court’s entry of summary judgment on Counts I and II.[7]
II. DISCUSSION
[¶ 12] This is the first case that has required us to interpret the Legislature’s 2005 amendments to the MHRA that prohibit discrimination based on sexual orientation in public accommodations, educational opportunities, employment, housing, and other areas. See P.L. 2005, ch. 10. Particularly where young children are involved, it can be challenging for a school to strike the appropriate balance between maintaining order and ensuring that a transgender student’s individual rights are respected and protected. Many of the school officials involved in Susan’s education exhibited tremendous sensitivity and insight over several years. The record reveals that her counselors and teachers strove to provide her with a supportive environment and were largely successful. As a result of its efforts, the school came under intense public scrutiny, which caused it to reconsider the propriety of the steps it had taken up to that point and ultimately to reverse course. We appreciate the difficulty of the situation in which the school found itself; nevertheless, we must assess schools’ obligations pursuant to the Legislature’s amendments to the MHRA without regard to the public’s potential discomfort with the result. It is for the Legislature, not this Court, to write laws establishing public policy, and we must respect that constitutional division of authority, absent the Legislature adopting a law violative of the Maine Constitution or the United States Constitution. There is no issue of the Legislature exceeding its constitutional authority in this case.
[¶ 13] “We review a grant of summary judgment de novo.” Levesque v. Androscoggin Cnty., 2012 ME 114, ¶ 5, 56 A.3d 1227. Summary judgment is properly granted “if the record reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law.” Id. (quotation marks omitted.)
[¶ 14] This case requires us to examine the relationship between the public-accommodations provision of the MHRA and a provision of the Sanitary Facilities subchapter of title 20-A, which regulates education. “[0]ur first task when interpreting a statute is to ascertain the real purpose of the legislation.” State v. Niles, 585 A.2d 181, 182 (Me.1990). Seemingly contradictory provisions should not be viewed as irreconcilable when they serve different purposes. Trask v. Pub. Utils. Comm’n, 1999 ME 93, ¶ 18, 731 A.2d 430. We give effect to the Legislature’s intent, avoiding results that are inconsistent or illogical “if the language of the statute is fairly susceptible to such a construction.” Cote v. Georgia-Pacific Corp., 596 A.2d 1004, 1005 (Me.1991). We must presume that the Legislature did not intend inconsistent results. Woodcock v. Atlass, 393 A.2d 167, 170 (Me.1978).
[¶ 15] In construing a statute, we may properly consider its “practical operation and potential consequences.” Clark v. State Emps. Appeals Bd., 363 A.2d 735, 738 (Me.1976). When one construction would lead to a result that is inimical to the public interest, and a different construction would avoid that result, the latter construction is to be favored *605 unless the terms of the statute absolutely forbid it. Id. Moreover, “[w]e have the power and duty ... to interpret statutes so as to avoid absurd results.” State v. Hopkins, 526 A.2d 945, 950 (Me.1987). “A court can even ignore the literal meaning of phrases if that meaning thwarts the clear legislative objective.” Niles, 585 A.2d at 182. Such an approach “is not judicial legislation; it is seeking and enforcing the true sense of the law notwithstanding its imperfection or generality of expression.” State v. Day, 132 Me. 38, 41, 165 A. 168 (1933).
Section 4592(1) of the MHRA provides, in relevant part:
It is unlawful public accommodations discrimination, in violation of this Act ... [f]or any public accommodation or any person who is the ... superintendent, agent, or employee of any place of public accommodation to directly or indirectly refuse, discriminate against or in any manner withhold from or deny the full and equal enjoyment to any person, on account of ... sexual orientation ... any of the accommodations ... [or] facilities ... of public accommodation....
Section 4602(4) of the MHRA extends the same prohibition against discrimination based on sexual orientation to educational institutions and educational opportunities, subject only to an exception in section 4553(10)(G)(3) for religious institutions and programs that do not receive public funds.
[¶ 16] The MHRA defines a “public accommodation” to include a public entity that “operates a place of public accommodation.” 5 M.R.S. § 4553(8-B) (2013). An elementary school is a place of public accommodation. 5 M.R.S. § 4553(8)(J) (2013). The definition of “discriminate” “includes, without limitation, [to] segregate or separate.” 5 M.R.S. § 4553(2) (2013). The definition of “sexual orientation” includes “a person’s actual or perceived gender identity or expression.” 5 M.R.S. § 4553(9-0 (2013). The MHRA provides no definition of “sex.”
[¶ 17] On the other hand, 20-A M.R.S. § 6501 requires that sanitary facilities be provided as follows:
1. Toilets. A school administrative unit shall provide clean toilets in all school buildings, which shall be:
[[Image here]]
B. Separated according to sex and accessible only by separate entrances and exits[.]
[¶ 18] Section 6501 is located in the “Sanitary Facilities” subchapter of the “Health, Nutrition, and Safety” chapter of title 20-A. It has not been amended since 1983. Its purpose is to establish cleanliness and maintenance requirements for school bathrooms, as well as requirements for the physical layout of toilet facilities. See 20-A M.R.S. § 2(1) (2013). It does not purport to establish guidelines for the use of school bathrooms. Nor does it address how schools should monitor which students use which bathroom, and it certainly offers no guidance concerning how gender identity relates to the use of sex-separated facilities. In contrast, the sole purpose of the public-accommodations and educational-opportunities provisions of the MHRA is to ensure equal enjoyment of and access to educational opportunities and public accommodations and facilities. The public-accommodations and educational-opportunities provisions were amended in 2005 to prohibit discrimination against transgender students in schools.[8]
*606 [¶ 19] Because these statutes serve different purposes, they are not irreconcilable; one makes it a -violation of the Maine Human Rights Act to discriminate in providing access to school bathrooms based on sexual orientation and the other requires schools to provide children with “clean toilets” separated according to sex. Although school buildings must, pursuant to section 6501, contain separate bathrooms for each sex, section 6501 does not — and school officials cannot — dictate the use of the bathrooms in a way that discriminates against students in violation of the MHRA.[9]
[¶ 20] RSU 26 argues that the sanitary-facilities provision preemptively created an exception to the MHRA’s prohibition on sexual orientation discrimination twenty-two years in advance of the passage of the relevant sections of the MHRA. However, we must presume that the Legislature did not intend the MHRA to be construed as inconsistent with section 6501. See Woodcock, 898 A.2d at 170. In this case, a consistent reading of the two statutes avoids conflicting, illogical results and comports with the legislative intent by giving effect to both provisions. Therefore, we adopt a consistent reading of the two provisions.
[¶ 21] Because section 6501 does not mandate, or even suggest, the manner in which transgender students should be permitted to use sex-separated facilities, each school is left with the responsibility of creating its own policies concerning how these public accommodations are to be used. Those policies must comply with the MHRA. Here, RSU 26 agreed with Susan’s family and counselors that, for this purpose (as for virtually all others), Susan is a girl. Based upon its determination that Susan is a girl, and in keeping with the information provided to the school by Susan’s family, her therapists, and experts in the field of transgender children, the school determined that Susan should use the girls’ bathroom. In so doing, the school provided her with the same access to public facilities that it provided other girls. In this regard, RSU 26 complied with both section 6501 and the MHRA.
[¶ 22] RSU 26’s later decision to ban Susan from the girls’ bathroom, based not on a determination that there had been some change in Susan’s status but on others’ complaints about the school’s well-considered decision, constituted discrimination based on Susan’s sexual orientation. See 5 M.R.S. § 4592(1). She was treated differently from other students solely because of her status as a transgender girl. This type of discrimination is forbidden by the MHRA, see id., and it is not excused by the school’s compliance with section 6501. We vacate the Superior Court’s entry of summary judgment and remand for entry of summary judgment in favor of the Does and the Commission.
[¶ 23] In vacating this judgment, we emphasize that in this case the school had a program carefully developed over several years and supported by an educational *607 plan designed to sensitively address Susan’s gender identity issues. The determination that discrimination is demonstrated in this case rests heavily on Susan’s gender identity and gender dysphoria diagnosis, both of which were acknowledged and accepted by the school. The school, her parents, her counselors, and her friends all accepted that Susan is a girl.
[¶ 24] Thus, we do not suggest that any person could demand access to any school facility or program based solely on a self-declaration of gender identity or confusion without the plans developed in cooperation with the school and the accepted and respected diagnosis that are present in this case. Our opinion must not be read to require schools to permit students casual access to any bathroom of their choice. Decisions about how to address students’ legitimate gender identity issues are not to be taken lightly. Where, as here, it has been clearly established that a student’s psychological well-being and educational success depend upon being permitted to use the communal bathroom consistent with her gender identity, denying access to the appropriate bathroom constitutes sexual orientation discrimination in violation of the MHRA.
The entry is:
Judgment vacated. Remanded for further proceedings consistent with this opinion.

. The Superior Court granted the Does permission to file their complaint using pseudonyms.

.Such plans derive their name from section 504 of the Rehabilitation Act of 1973. P.L. 93-112, Title V, § 504 (September 26, 1973.) That section has since been amended, and can now be found at 29 U.S.C.A. § 794 (West, Westlaw through P.L. 113-65). It prohibits discrimination based on disability in any program or activity that receives federal funds, including local schools. 29 U.S.C.A. § 794(a), (b)(2)(B).

. The communal bathroom for girls had separate stalls for each individual user.

. The 504 process is typically used to help students who have disabilities, but who do not require a special education program. Although Susan did not have a disability, the format of the 504 plan was useful for addressing the impact of her gender identity issues on her educational experience.

. Both the Does' complaint with the Commission and the original complaint in Superior Court named four defendants. By stipulation, all defendants other than RSU 26 were dismissed with prejudice after RSU 26 assumed their liability.

. The Does' complaint also included a claim for intentional infliction of emotional distress, but that count was dismissed with prejudice by stipulation.

. Appellants do not challenge the entry of summary judgment on Counts IV and V, which alleged that RSU 26 failed to remedy a hostile education environment resulting from peer harassment during Susan's fifth- and sixth-grade years.

. Title 5 M.R.S. § 4592 was amended in 2005 to add "sexual orientation,” which, pursuant to 5 M.R.S. § 4553(9-C) (2013), includes gender identity, as a protected class, P.L. 2005, ch. 10, §§ 3, 17 (effective March 31, 2005).

. The Maine Human Rights Commission’s 1984 interpretation of the Maine Human Rights Act provides that "[a]n educational institution may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.” 11 C.M.R. 94 348 ch. 4 § 4.13 (2000). This regulation simply confirms that schools may provide separate bathrooms in compliance with 20-A M.R.S. § 6501 (2013) and emphasizes that neither sex may be given preferential treatment. Like section 6501, however, it predates by more than twenty years the inclusion of sexual orientation in the MHRA. It offers no guidance concerning use of sex-separated facilities by transgender students, and is therefore of minimal relevance to the present analysis.