# Illinois Official Reports

## Appellate Court

---

**Hobby Lobby Stores, Inc. v. Sommerville**, 2021 IL App (2d) 190362

---

| | |
|---|---|
| Appellate Court Caption | HOBBY LOBBY STORES, INC., Petitioner, v. MEGGAN SOMMERVILLE and THE HUMAN RIGHTS COMMISSION, Respondents. |
| District & No. | Second District<br>No. 2-19-0362 |
| Filed | August 13, 2021 |
| Decision Under Review | Petition for review of order of Illinois Human Rights Commission, Nos. 2011-CN-2993, 2011-CN-2994. |
| Judgment | Commission decision affirmed and remanded. |
| Counsel on Appeal | Whitman H. Brisky and Terry S. Lu, of Mauck & Baker, LLC, of Chicago, for petitioner.<br><br>Jacob Meister, of Jacob Meister & Associates, of Chicago, for respondent Meggan Sommerville.<br><br>Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Evan Siegel and Maura Forde O'Meara, Assistant Attorney General, of counsel), for other respondent. |

Camilla B. Taylor and Kara N. Ingelhart, of Lambda Legal Defense & Education Fund, Inc., of Chicago; Sasha J. Buchert (*pro hac vice*) and Diane Flynn (*pro hac vice*), of Lambda Legal Defense & Education Fund, Inc., of Washington D.C.; Avatara A. Smith-Carrington (*pro hac vice*), of Lambda Legal Defense & Education Fund, Inc., of Dallas, Texas; Ethan Rice (*pro hac vice*), of Lambda Legal Defense & Education Fund, Inc., of New York, New York; and Gregory R. Nevins (*pro hac vice*), of Lambda Legal Defense & Education Fund, Inc., of Atlanta, Georgia, for *amici curiae* Lambda Legal Defense & Fund, Inc., and Equality Illinois.

John Knight, Ghirlandi Guidetti, Carolyn Wald, Ameri Klafeta, and Emily Werth, of Roger Baldwin Foundation of ACLU, Inc., and Terra Reynolds, Nicholas J. Siciliano, Renatta A. Gorski, and Edwin D. Abundis, of Latham & Watkins, LLP, both of Chicago, for *amici curiae* American Civil Liberties Union of Illinois *et al*.

| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. Justices Zenoff and Jorgensen concurred in the judgment and opinion. |

## OPINION

¶ 1    This appeal raises an issue of first impression in Illinois: whether an employer violates the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2010)) by denying a transgender woman the use of the women's bathroom. The Human Rights Commission (Commission) found that the petitioner, Hobby Lobby Stores, Inc., violated both article 2 of the Act (prohibiting discrimination based on, among other things, gender identity, in the terms and conditions of employment) and article 5 (prohibiting such discrimination in the provision of facilities in a place of public accommodation). It awarded the respondent, Meggan Sommerville, damages and injunctive relief requiring Hobby Lobby to grant Sommerville access to the women's bathroom.

¶ 2    Hobby Lobby appeals, arguing that its policy of regulating bathroom access based upon users' "sex"—which, it contends, means their reproductive organs and structures—does not violate the Act. It also argues that the damages awarded were too high.[1] We affirm.

---

[1]Hobby Lobby also attempted to raise, through an untimely amendment of its petition for review, an argument regarding the professional background of the ALJ who issued the recommended orders in this case. However, the amended petition was dismissed for lack of jurisdiction, and that argument is not before us.

I. BACKGROUND

The following facts are drawn from the factual findings of the administrative law judge (ALJ), which were adopted by the Commission. Hobby Lobby does not challenge any of these factual findings on appeal.

Sommerville, who was born in 1969, was designated as male at birth and given a boy's name. Hobby Lobby hired Sommerville in July 1998. A few years later, Sommerville was transferred to Hobby Lobby's East Aurora store. Sommerville was present at the store as a customer as well as an employee. The restrooms at the store, which are used both by employees and customers, are designated by sex. It is undisputed that the store is not only Sommerville's workplace but also a "public place of accommodation" under the Act. Hobby Lobby also does not dispute that access to a bathroom can be part of the "terms, privileges or conditions of employment" covered under the Act. *Id.* § 2-102(A).

In 2007, Sommerville began transitioning from male to female. In 2009, she disclosed her female gender identity to some staff at Hobby Lobby and began medical treatment that resulted in female secondary sex characteristics such as breasts and the absence of facial hair. In early 2010, she began to use her female name and appear at work in feminine dress and makeup, without objection from Hobby Lobby. In July 2010, she obtained a court order, legally changing her name to Meggan Renee Sommerville, and a new Illinois driver's license and Social Security card, both of which showed her new name and identified her as female.

On July 9, 2010, Sommerville formally informed Hobby Lobby of her transition and her intent to begin using the women's bathroom at the store. Hobby Lobby changed Sommerville's personnel records and benefits information to reflect her female identity. However, Hobby Lobby refused to allow Sommerville to use the women's bathroom at the store. Faced with an initial demand that she produce "legal authority" requiring it to allow her to use the women's bathroom, Sommerville provided Hobby Lobby with a variety of documentation including her driver's license, Social Security card, and name change court order; a letter from her medical providers identifying her as a female transgender individual, describing the transition process, and urging that she be allowed to use the women's bathroom; and a copy of the Act and similar statutes from Iowa and Colorado. However, Hobby Lobby continued to refuse to allow her to use the women's bathroom.

Sommerville occasionally used the women's bathroom at the store despite Hobby Lobby's policy. However, Hobby Lobby assertively enforced its policy, ordering employees to report Sommerville if she tried to use the women's bathroom. On February 23, 2011, she was given a written warning for entering the women's bathroom at the store. Sommerville testified that she was "emotionally devastated" by the discipline, and her supervisor testified that she was "very upset" and "broke down crying." In February 2013, she filed complaints with the Commission, alleging that she had been discriminated against on the basis of her gender identity in violation of articles 2 and 5 of the Act, which cover employment and public accommodations.

Over the course of the litigation, Hobby Lobby repeatedly changed its precondition for Sommerville's use of the women's bathroom, at one point requiring that Sommerville undergo surgery and then requiring that she produce a birth certificate reflecting her sex as female. In December 2013, Hobby Lobby installed a unisex bathroom at the store. Store employees and customers were permitted to use either the bathroom corresponding to their sex or the unisex bathroom. However, Hobby Lobby still did not permit Sommerville to use the store's women's

bathroom. Sommerville testified that, in the face of Hobby Lobby's continued denial of access to the bathroom matching her gender identity, the availability of the unisex bathroom did not ameliorate her feeling of being singled out for different treatment because of her transgender status. She "felt like [in] some ways they were recognizing me as female, but yet they were segregating me. I felt as though there were the guys, the gals, and then me."

¶ 10    Regarding Sommerville's damages, the Commission found that Sommerville had suffered and continued to suffer emotional distress caused by Hobby Lobby's denial of access to the women's bathroom at the store. Although Sommerville was permitted to use the men's bathroom at the store, such use caused her anxiety, as she had to engage in "defensive maneuvers" before entering, such as checking and waiting to make sure that no one else was using the bathroom and attempting to ensure that no one observed her enter, due to her female appearance. She was anxious for her safety once she was inside, as "the violence against the transgender community is very well documented" and she was afraid of people's reactions if they learned she was there. She also felt embarrassed and humiliated by being a woman in the men's bathroom. If she instead left the store to use the women's bathroom at a neighboring business, she had to consider the number of occasions, length of time needed, and logistics so as not to negatively affect her employment duties. Sommerville testified that she "ended up having to structure [her] life around how often [she] would be able to use the restroom."

¶ 11    As a result of Hobby Lobby's ban on her using the women's bathroom at work, Sommerville was driven to try various ways of coping with her need to use the bathroom. For a couple of years, she was able to "hold it" and refrain from using the bathroom until her lunch break. In 2012, however, she was diagnosed with a medical condition that led to her needing to use the bathroom three or four times each day. She then began limiting her fluid intake and not eating breakfast, even when her family was eating. If she left the store to use the bathroom at nearby businesses, she had to punch out from her work shift and walk about 10 minutes each way, a walk that occurred in foul or fair weather.

¶ 12    Hobby Lobby's bathroom ban gave Sommerville recurrent nightmares about bathrooms, being approached by men, and being physically assaulted and laughed at by them. She also developed physical symptoms including headaches, fatigue, muscle cramps, gastric problems, and dehydration due to restricting her fluid intake.

¶ 13    After the parties filed cross-motions for summary judgment, the ALJ issued a recommended liability determination finding that Hobby Lobby's bathroom policy discriminated against Sommerville on the basis of gender identity, violating articles 2 and 5 of the Act. It therefore granted Sommerville's motion for summary judgment and denied Hobby Lobby's motion. After further proceedings relating to damages, the ALJ awarded Sommerville $220,000 in damages for her emotional distress and attorney fees. The Commission adopted all of these recommendations in a final order entered April 10, 2019.

¶ 14    Hobby Lobby sought review in this court, and it also sought to stay the damages and injunctive relief (primarily, ordering Hobby Lobby to allow Sommerville to use the women's bathroom) awarded by the Commission. The Commission granted Hobby Lobby's motion to stay in part, staying the damages award but denying the stay as to the injunctive relief. Hobby Lobby renewed its motion to stay in this court, and on October 30, 2019, we granted that motion, thereby staying the injunctive relief as well during the pendency of this appeal. With the issuance of this decision, we now lift that stay.

## II. ANALYSIS

In this appeal, Hobby Lobby argues that the Commission erred in finding that it had discriminated against Sommerville in violation of the Act by refusing to allow her to use the women's bathroom in the store where she worked and shopped. Hobby Lobby also argues that the Commission abused its discretion in awarding damages. Neither contention has merit.

### A. Hobby Lobby's Liability for Discrimination

#### 1. Legal Standards and General Principles

In challenging the Commission's finding that its bathroom policy violated Sommerville's civil rights, Hobby Lobby argues that the Commission misinterpreted and misapplied the Act. As this is a purely legal question of statutory interpretation, our review is *de novo*. *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶ 22.

When construing a statute, our task is to "ascertain and give effect to the legislature's intent." *Lieb v. Judges' Retirement System*, 314 Ill. App. 3d 87, 92 (2000). The best indicator of the legislature's intent is the plain language of the statute. *Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 43 (2003). "When the statute's language is clear, it will be given effect without resort to other aids of statutory construction." *Id.* "A court may also consider the reason for the statute, the problems it seeks to remedy, the purposes to be achieved, and the consequences of interpreting the statute one way or another." *Sperl v. Henry*, 2018 IL 123132, ¶ 23. "One of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole," and thus "words and phrases must be interpreted in light of other relevant provisions of the statute." *J.S.A. v. M.H.*, 224 Ill. 2d 182, 197 (2007). However, we will not depart from the plain language of a statute by inserting exceptions, limitations, or conditions that conflict with the express legislative intent. *In re Michael D.*, 2015 IL 119178, ¶ 9. With respect to the Act in particular, our supreme court has recognized that it is remedial legislation and thus "should be construed liberally to achieve its purpose." *Sangamon County Sheriff's Department v. Illinois Human Rights Comm'n*, 233 Ill. 2d 125, 140 (2009).

#### 2. Did Hobby Lobby Violate the Act?

The Act reflects the public policy of this State. 775 ILCS 5/1-102 (West 2010). One of the declared goals of that public policy is "[t]o secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her *** sex, *** [or] sexual orientation *** in connection with employment *** and the availability of public accommodations." *Id.* § 1-102(A). Under the Act, it is a civil rights violation for "any employer to *** segregate, or to act with respect to *** discipline *** or terms, privileges or conditions of employment on the basis of unlawful discrimination" (*id.* § 2-102(A)) and for any public place of accommodation to "[d]eny or refuse to another the full and equal enjoyment of the facilities," based on unlawful discrimination (*id.* § 5-102(A)). "Unlawful discrimination" is a defined term that includes "discrimination against a person because of his or her actual or perceived *** sex *** [or] sexual orientation *** as those terms are defined in this Section." *Id.* § 1-103(Q).

"Sex" is defined in the Act as "the status of being male or female." *Id.* § 1-103(O). The definition of "sexual orientation" encompasses several aspects of human sexuality, including

"gender-related identity, whether or not traditionally associated with the person's designated sex at birth." *Id.* § 1-103(O-1).

¶ 24      There is no real dispute that, in this case, Hobby Lobby is barring Sommerville from using the women's bathroom because she is a transgender woman, that is, a woman whose "designated sex at birth" was male, instead of a woman who was designated as a female at birth. Hobby Lobby's conduct thus falls squarely within the definition of unlawful discrimination under the Act, as it treats Sommerville differently from all other women who work or shop at its store, solely on the basis that her gender identity is not "traditionally associated with" her "designated sex at birth." *Id.* The Commission did not err in finding that Hobby Lobby's conduct of denying Sommerville access to its women's bathroom violated her civil rights under articles 2 and 5 of the Act.

¶ 25      Hobby Lobby argues that the Commission misunderstood the Act, improperly conflating "sex" with "sexual orientation." Specifically, it argues that it limited access to its bathrooms based on sex, not gender identity, and that the Act permitted it to do so. It also argues that "sex" means "reproductive organs and structures" and thus Sommerville (who has not had a surgical vaginoplasty or labiaplasty) is of the male sex. As the proper definition of "sex" under the Act lies at the heart of Hobby Lobby's arguments, we begin there.

¶ 26      As noted, the Act defines "sex" as "the status of being male or female." *Id.* § 1-103(O). The phrasing of this definition is broad: it does not draw distinctions based on genitalia, the sex marker used on a birth certificate, or genetic information. Moreover, it uses the word "status." At law, a "status" is a state of being that may be subject to change. "Marital status" is one obvious example of this, as it may change depending on an individual's actions or external events. Similarly, "resident status" (the condition of being a resident of a particular area) may change depending on whether one continues to live in that area. See, *e.g.*, *Cannici v. Village of Melrose Park*, 2019 IL App (1st) 181422, ¶ 41 (firefighter who moved his principal residence out of village no longer had resident status). Hobby Lobby contends that an individual's "sex"—the status of being male or female—is an immutable condition. However, the plain language of the Act does not support this conception. There is simply no basis in the Act for treating the "status" of being male or female as eternally fixed.[2]

¶ 27      Hobby Lobby argues that the Commission improperly conflated "sex" and "gender identity," which "are not synonymous." We agree that of course these two terms are not synonymous; after all, each term is defined separately in the Act. See 775 ILCS 5/1-103(O), (O-1) (West 2010). However, neither are these two terms wholly unrelated. To begin with, section O-1, the provision referring to gender identity, itself uses the term "sex," showing that the two provisions must be read together. See *id.* § 1-103(O-1) ("[s]exual orientation" includes "gender-related identity, whether or not traditionally associated with the person's designated sex at birth"). Further, by defining "sex" broadly as a status, without any reference to anatomy,

---

[2]Indeed, it is worth noting that, although Hobby Lobby has advanced a variety of different meanings of "female" over the course of this litigation, at different points suggesting that it would allow Sommerville to use the women's bathroom if she could produce a birth certificate with a female sex marker or if she underwent genital surgery, none of these scenarios is impossible. Thus, even the restrictions on "female" status advanced by Hobby Lobby are things that can be changed. Hobby Lobby's argument that female status is somehow immutable is belied not only by the Act but also by its own conduct.

birth certificates, or genetics, the Act allows for the consideration of gender identity as one of the factors that may be used to determine sex.

¶ 28    It has been 15 years since protections against discrimination on the basis of sexual orientation, which includes gender identity, were added to the Act. See Pub. Act 93-1078, § 5 (eff. Jan. 1, 2006) (amending 775 ILCS 5/1-103). In that time, Illinois law has explicitly recognized in a variety of ways that gender identity is a primary determinant of a person's "sex" for legal purposes. In Illinois, a transgender person can receive a birth certificate with a corrected sex marker upon presenting the vital records division with a declaration by a health care professional that the person has received medically appropriate gender transition treatment. 410 ILCS 535/17(d) (West 2020). Similarly, a transgender person may apply to correct the sex designation on a driver's license simply by signing an attestation of the person's gender identity. Illinoisans can also mandate the gender identity, expression, and pronouns to be used in funeral and burial instructions. 755 ILCS 65/40 (West 2020). All of these provisions demonstrate that, under Illinois law, an individual's gender identity is an accepted basis for determining that individual's legal "sex." *Cf. Bostock v. Clayton County, Georgia*, 590 U.S. ___, ___, 140 S. Ct. 1731, 1741-42 (2020) (under Title VII, discrimination "because of sex" encompasses discrimination based on transgender status).

¶ 29    Given the interrelationship between "sex" and gender identity in Illinois law, the record establishes that Sommerville's sex is unquestionably female. She has undergone years of effort and expense to transition, and she appears to be and comports herself as a woman. Of even greater significance, her status of being female has been recognized not only by the governments of this state and the nation but also by Hobby Lobby itself, all of which have changed their records to acknowledge her female sex. Given this recognition, Hobby Lobby cannot plausibly assert that it is denying Sommerville access to the women's bathroom on the ground that she is not female.

¶ 30    Hobby Lobby contends that, rather than applying the definition of "sex" provided by the Act, the Commission should have imported a definition of "sex" found in a dictionary, namely: one of two "forms of individuals" that "are distinguished *** especially on the basis of their reproductive organs and structures." See Merriam-Webster Online Dictionary, https://www. merriam-webster.com/dictionary/sex (last visited Aug. 3, 2021) [https://perma.cc/4RHC-ZMNK]. Thus, it argues, it could condition access to the women's bathroom on the possession of female "reproductive organs and structures." However, it is unnecessary to resort to dictionary definitions where a statute itself defines a term. *Sangamon County Sheriff's Department*, 233 Ill. 2d at 137. Here, the Act provides a clear definition of "sex," eliminating any need to look further. Moreover, the Act's definition of "sex" nowhere includes any restriction of that term on the basis of reproductive organs and structures, and we may not insert such a limitation into the statute. See *id.* at 138 ("Where the statutory language is clear, we may not read into it limitations that the legislature did not express."); see also *Michael D.*, 2015 IL 119178, ¶ 9. Thus, the statutory definition of "sex" cannot be construed to include any requirement related to reproductive organs or anatomy. Anatomy may not be irrelevant to the determination of an individual's sex, but under the Act it cannot be the *sine qua non*. And where the State has recognized a transgender person's sex, the Act affords no basis for an employer to reject that recognized sex designation merely because the person's anatomy does not uniformly match that designation.

### 3. The Bathroom Exemption

¶ 32    Hobby Lobby next argues that its refusal to allow Sommerville to use the women's bathroom is not discriminatory but is simply a reasonable application of the Act's "bathroom exemption," which allows the designation of separate bathrooms for men and women. In article 5, the Act provides that places of public accommodation may restrict access to bathrooms and other facilities that are of a "distinctly private" nature on the basis of sex and that such restriction is not a civil rights violation. 775 ILCS 5/5-103(B) (West 2010). Thus, Hobby Lobby argues, its refusal to allow Sommerville to use the women's bathroom cannot subject it to liability under either article 2 or 5. As a preliminary matter, we note that there is a flaw in Hobby Lobby's reasoning that the bathroom exemption in article 5 (public accommodations) also prevents liability under article 2 (employment): the provision explicitly states that it is limited to article 5 claims. See *id.* ("[n]othing in *this Article* shall apply to" "discrimination based on sex" in a facility that is "distinctly private in nature such as restrooms" (emphasis added)). Article 2 has its own exemptions provision (see *id.* § 2-104), which does not mention bathrooms. Thus, it is logical to presume that the legislature intended the bathroom exemption to apply only in claims under article 5, not those brought under article 2.

¶ 33    Leaving this aside, however, there is a more fundamental problem with Hobby Lobby's argument, which is that it does not excuse Hobby Lobby's conduct here. As we have noted, Sommerville is a transgender woman, and she is classified as female by this State and in Hobby Lobby's own personnel records. Nevertheless, Hobby Lobby denies her the ability to use the women's bathroom, thereby treating her differently than its other female employees and customers. This differential treatment cannot be considered to be "discrimination based on sex": Sommerville is female, just like the women who are permitted to use the women's bathroom. The only reason that Sommerville is barred from using the women's bathroom is that she is a *transgender* woman, unlike the other women (at least, as far as Hobby Lobby knows). Thus, the Commission correctly found that Hobby Lobby unlawfully discriminated against Sommerville based on her gender identity, that is, because she is transgender. Even as to article 5 claims, the bathroom exemption does not excuse discrimination based on gender identity. It therefore cannot aid Hobby Lobby here.

¶ 34    Hobby Lobby also argues that the Commission's application of the Act here effectively nullified the bathroom exemption, because the decision implies that employers are not allowed to designate bathrooms on the basis of sex. This is simply not so. The Commission's decision in no way can be read as prohibiting employers and businesses in Illinois from maintaining separate bathrooms for men and women. Hobby Lobby argues that it was simply acting as a reasonable employer and enforcing its rules about separate bathrooms by keeping a male out of the women's bathroom, but Hobby Lobby itself recognizes that Sommerville is female. Hobby Lobby's unlawful discrimination was not designating bathrooms by sex but denying Sommerville access to the bathroom that matched her sex. See *Grimm v. Gloucester County School Board*, 972 F.3d 586, 618 (4th Cir. 2020) (existence of bathroom exemption in Title IX merely "suggests *** that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to [transgender persons], the Board may rely on its own discriminatory notions of what 'sex' means"); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020) ("just because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity"); *Doe v. Regional School Unit 26*,

2014 ME 11, ¶ 19, 86 A.3d 600 (school code provision requiring separate bathrooms for girls and boys did not purport to dictate the use of those facilities by students: "[a]lthough school buildings must *** contain separate bathrooms for each sex, [the school code] does not—and school officials cannot—dictate the use of the bathrooms in a way that discriminates against students in violation of" the state's human rights act).

¶ 35                                4. Remaining Arguments

¶ 36        Hobby Lobby raises other arguments as well, but none have merit. It argues that we should look to legislative history in interpreting the Act, contending that the floor debates on the 2006 amendment adding sexual orientation and gender identity to the Act show that the legislature did not intend the amendment to cover bathroom usage. But, as Hobby Lobby admits, where a statute's language is clear and unambiguous, we must give effect to that language without resorting to aids of statutory construction such as legislative history. See *Lee*, 208 Ill. 2d at 43. Here the statute's meaning is clear, and thus we must simply give effect to it. We also note that the legislative history cited by Hobby Lobby does not support its contention, as it never states that the Act was *not* intended to cover bathroom usage. See 93d Ill. Gen. Assem., Senate Proceedings, Jan. 10, 2005, at 47-53; 93d Ill. Gen. Assem., House Proceedings, Jan. 11, 2005, at 6-24.

¶ 37        Hobby Lobby also objects to the Commission's characterization of the unisex bathroom as similar to the "separate, but equal" approach rejected in *Brown v. Board of Education of Topeka*, 347 U.S. 483, 493 (1954). However, the existence of the unisex bathroom is irrelevant to the main issue in this case, which is whether Hobby Lobby violated Sommerville's civil rights in denying her, but not other women, access to the women's bathroom. Hobby Lobby's provision of a unisex bathroom available to all employees and customers cannot cure its unequal treatment of Sommerville with respect to the women's bathroom. If every employee and customer except Sommerville may use either the unisex bathroom or the bathroom corresponding to their sex but Sommerville's choices are limited to the unisex bathroom or a bathroom that does not correspond to her sex, Hobby Lobby is still discriminating unlawfully.

¶ 38        Hobby Lobby also argues that the Commission should have looked to *Goins v. West Group*, 635 N.W.2d 717 (Minn. 2001), a 20-year-old decision by the Minnesota Supreme Court holding that denial of bathroom access to a transgender person did not violate that state's human rights act. But the plain language of the Act (which differs from the statute at issue in *Goins*) must trump reliance on foreign case law. See *Sangamon County Sheriff's Department*, 233 Ill. 2d at 139 ("[o]n the issue of employer liability [under the Act], we are bound by the language of the Act, not by decisions" of foreign courts).

¶ 39        Moreover, were we to take note of foreign case law, the single case of *Goins* would be overwhelmed by the tide of federal and state law upholding the right of transgender persons to be free from discrimination in employment and in access to bathrooms matching their gender identity. See, *e.g.*, *Bostock*, 590 U.S. at ___, 140 S. Ct. at 1754 (discrimination against transgender employees violated Title VII); *Grimm*, 972 F.3d at 616, 619 (school board's denial of transgender boy's access to the boys' bathroom violated his equal protection rights and Title IX); *Adams v. School Board of St. Johns County*, 968 F.3d 1286, 1310-11 (11th Cir. 2020) (same); *Parents for Privacy*, 949 F.3d at 1225 (privacy rights of cisgender students were not harmed by school policy allowing transgender students to use the bathrooms corresponding with their gender identities); *R.M.A. v. Blue Springs R.-IV School District*, 568 S.W.3d 420,

- 9 -

428-29 (Mo. 2019) (transgender boy who was denied access to the boys' bathrooms and locker rooms stated a claim for discrimination in a public accommodation); *Doe v. Boyertown Area School District*, 897 F.3d 518, 533 (3rd Cir. 2018) (no privacy violation in permitting transgender students to use the sex-segregated spaces matching their gender identity; "the presence of transgender students in [bathrooms and locker rooms] does not offend the constitutional right of privacy any more than the presence of cisgender students"); *Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034, 1053, 1055 (7th Cir. 2017) (upholding injunction against enforcement of school policy restricting bathroom access on the basis of the sex marker on students' birth certificates, noting that "it is unclear that the sex marker on a birth certificate can even be used as a true proxy for an individual's biological sex," as it does not take into account an individual's genetic makeup or the possibility of ambiguous external genitalia); *Dodds v. United States Department of Education*, 845 F.3d 217, 221-22 (6th Cir. 2016) (balance of harms and likelihood of success on merits supported injunction permitting transgender girl student to use girls' bathrooms at school); *Doe*, 2014 ME 11, ¶ 19 (barring transgender girl from girls' bathroom violated her civil rights under Maine's human rights act); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ("discrimination against a transgender individual because of her gender-nonconformity" violated equal rights and Title VII, "whether it's described as being on the basis of sex or gender"); *Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000) (male customer who was denied the opportunity to apply for a loan because he was dressed in women's clothing stated claim of discrimination). In light of the Act's plain language and the wealth of case law supporting the right of transgender persons to use the bathroom corresponding to their gender identity, we do not find *Goins* persuasive.

¶ 40 The final argument raised by Hobby Lobby regarding its bathroom ban—that it was necessary to protect other women from Sommerville—lacks support in either the record or logic. Hobby Lobby asserts that, in 2006 (before her transition or the events at issue here), Sommerville engaged in misconduct toward women that included verbal disparagement and unwanted touching of one woman, such as "side-hugging" and touches on the arm, back, and leg. It argues that it was therefore justified in barring Sommerville from using the women's bathroom. However, there is no evidence in the record to support Hobby Lobby's assertion of misconduct. Although Hobby Lobby cites a letter issued by its own counsel that contains these allegations, it does not point to any substantive evidence in the record such as write-ups or other contemporaneous accounts. It is axiomatic that, unless they fall into a narrow class of judicial admissions, the statements of counsel are not evidence. *Rock Island Metal Foundry, Inc. v. City of Rock Island*, 414 Ill. 436, 439 (1953). As Hobby Lobby's assertions lack any other support, we must disregard them. See *id.* Similarly, Hobby Lobby contends that, in January or February of 2011, two female employees who had previously known Sommerville as a male reported that they would feel "uncomfortable" if Sommerville were to use the women's bathroom. Once again, however, Hobby Lobby does not identify any evidence of these supposed objections; the sole record cite is to a motion, and the cites therein do not provide evidence of the alleged complaints by coworkers. Thus, Hobby Lobby fails to provide any actual evidence showing either that Sommerville engaged in misconduct toward women or that female coworkers voiced concerns about Sommerville using the women's bathroom— much less that there was any link between the two. There is simply no evidence that Sommerville's use of the women's bathroom would pose a safety risk to other women.

¶ 41    Parties must support their arguments in this court with appropriate citations of the record and pertinent legal authority. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). The failure to provide such support results in forfeiture of the argument. *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56. We have no basis on which to entertain Hobby Lobby's argument that its refusal to allow Sommerville to use the women's bathroom in 2011 was justified by any concern about her based on purported misconduct in 2006.

¶ 42    Moreover, even if there were evidence to support Hobby Lobby's assertions, its argument is illogical and finds no basis in the Act. Employers may of course occasionally find that an employee has engaged in misconduct, and that misconduct may justify appropriate discipline of the employee. Misconduct cannot justify discrimination, however—an employer cannot engage in discrimination against an employee under the guise of "discipline." These principles apply here: if Sommerville engaged in misconduct in 2006, that could justify the imposition of prompt disciplinary action.[3] But misconduct in 2006, by itself, could not justify denying Sommerville access to the women's bathroom in 2011. Nor is preventing bathroom access a logical or appropriate method of discipline. If Hobby Lobby were employing someone who genuinely posed a safety threat to others, its employees and customers would certainly demand a more effective safeguard than preventing that person from using the bathroom.

¶ 43    Rather, Hobby Lobby's argument seeks to give weight to the fears or discomfort of others. However, courts have firmly rejected the proposition that such fears or discomfort are an adequate justification for a discriminatory policy. The presence of a transgender person in a bathroom poses no greater inherent risk to privacy or safety than that posed by anyone else who uses the bathroom. See *Whitaker*, 858 F.3d at 1052. In arguing that Sommerville's use of the women's bathroom will cause a legitimate intrusion upon privacy, Hobby Lobby "ignores the reality of how a transgender [person] uses the bathroom: 'by entering a stall and closing the door.' " *Grimm*, 972 F.3d at 613 (quoting *Whitaker*, 858 F.3d at 1052). We will not prioritize fears or discomfort that have no factual basis in the record. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

¶ 44                                    B. Damages

¶ 45    Having determined that the Commission correctly found that Hobby Lobby violated the Act, we turn to the issue of damages. Hobby Lobby argues that the Commission's award of $220,000 as recompense for the emotional distress endured by Sommerville was excessive for several reasons. We do not find its arguments persuasive.

¶ 46    The Act provides for the award of actual damages (775 ILCS 5/8A-104(B) (West 2010)), which includes damages for emotional distress (*Szkoda v. Human Rights Comm'n*, 302 Ill. App. 3d 532, 545 (1998)). In a discrimination case, such damages include compensation for mental anguish, humiliation, and embarrassment. *Id.* In awarding damages for emotional distress, the Commission must consider the totality of the circumstances, including the nature

---

[3]Hobby Lobby says it in fact took disciplinary action against Sommerville in 2006, although again it does not cite any actual evidence on this point. The evidence that *is* in the record—that Hobby Lobby continued to employ Sommerville and still employs her 15 years later—permits the reasonable inference that Hobby Lobby does not view Sommerville's alleged past misconduct as posing any continuing threat to others.

- 11 -

and duration of the discriminatory treatment and its effect on the complainant. *Smith*, Ill. Hum. Rts. Comm'n No. 1982CF1564, 2005 WL 3452447, at *6 (Oct. 31, 2005) ("The measure of damages should be whether the amount of the award is appropriate in light of the nature and duration of the suffering experienced by the Complainant.").

¶ 47    Here, the Commission adopted the ALJ's finding that Sommerville experienced substantial mental and emotional distress from Hobby Lobby's discriminatory bathroom policy. The record contains evidence that Sommerville experienced embarrassment and humiliation daily by being singled out for disparate treatment on the basis of her gender identity and being denied the ability to use the women's bathroom. Three to four times a day, she was forced to choose whether to endure the shame and anxiety of using the men's bathroom, risk discipline for using the women's bathroom, or risk neglecting her job duties by leaving her workplace to use the women's bathroom at another business. Her distress drove her to avoid liquid intake, resulting in dehydration. The stress also made her subject to bursts of crying, headaches, and nightmares regularly.

¶ 48    The Commission found that, by the time of the hearing on damages in February 2016, Sommerville had been experiencing this daily emotional distress for over five years. This finding of duration was based on the fact that, in July 2010, Sommerville put her employer on notice that she should be considered female and accordingly that she intended to use the women's bathroom. We note that this notification was not "out of the blue": Sommerville first began her transition three years earlier, had already developed female characteristics such as breasts and the absence of facial hair, and had begun using her female name and adopting feminine clothing months earlier. July 2010 is also when she told Hobby Lobby that she wished to use the women's bathroom, and Hobby Lobby denied her permission to do so. Thus, the time when the damages began accruing is not in dispute. The ALJ's recommendation of $220,000 in emotional distress damages, which the Commission adopted, was based both on the pervasive nature of Sommerville's daily humiliation and on its duration, which extended for years.

¶ 49    Courts will not disturb the amount of damages awarded by the Commission to a successful claimant absent an abuse of discretion. *Windsor Clothing Store v. Castro*, 2015 IL App (1st) 142999, ¶ 48. To establish an abuse of discretion, Hobby Lobby would have to show that the Commission's award was "arbitrary and capricious," or that no reasonable person would agree with it. *Id.* (citing *Young v. Illinois Human Rights Comm'n*, 2012 IL App (1st) 112204, ¶ 33). "A decision is arbitrary and capricious if it contravenes legislative intent, fails to consider a critical aspect of the matter, or offers an explanation so implausible it cannot be considered an exercise of the agency's expertise." *Id.* In light of the evidence in the record here, we cannot find that the damages award contravened the legislative intent animating the Act or was otherwise arbitrary or capricious.

¶ 50    Hobby Lobby offers several arguments, but none of them demonstrate that the award was arbitrary or capricious. It first argues that the award, which was the highest amount ever awarded by the Commission for emotional distress, is not in line with previous Commission decisions. To support its argument, Hobby Lobby cites various Commission decisions and argues that Sommerville's emotional distress was not as severe as the emotional distress experienced by the complainants in those cases because, unlike them, Sommerville did not receive derogatory comments and, although she feared for her safety, she was not the victim of any actual threats or assaults.

¶ 51      A party cannot show that a damages award was excessive merely by citing other decisions. Illinois courts have traditionally declined to compare damages awarded in one case to damages awarded in other cases when determining whether a particular award is excessive. *Richardson v. Chapman*, 175 Ill. 2d 98, 114 (1997); see also *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 221.

¶ 52      Further, an examination of the cases cited by Hobby Lobby shows that the award here is not out of line. For instance, in *May*, Ill. Hum. Rts. Comm'n No. 2003CF1676, 2009 WL 6381320 (Nov. 24, 2009), the complainant established that, over the one-year course of her employment, her employer spoke in a derogatory fashion about the complainant's race and sex, paid her less than other employees, and failed to promote her. This caused stress that resulted in head and chest pain, and she lost weight. *Id.* at *5. The Commission awarded her $50,000 as compensation for her emotional distress. *Id.* at *9. The complainant in *May* experienced a year of discriminatory treatment from her employer. By comparison, Sommerville experienced over five years of daily discriminatory treatment by Hobby Lobby. If we were to compare cases, the much greater duration of the discriminatory treatment here could justify a damages award five times greater than in *May*, *i.e.*, $250,000. The damages award here is less than that. Other cases similarly confirm that the award here is not excessive when the duration of the discrimination is taken into account. See, *e.g.*, *Michael S.*, Ill. Hum. Rts. Comm'n No. 2015CP3418, 2019 WL 7494510, at *13-14 (Sept. 11, 2019) (awarding $55,000 in emotional distress damages to transgender boy student denied access to boys' bathrooms and locker rooms for approximately four months); *Windsor*, 2015 IL App (1st) 142999 (complainant awarded emotional distress damages of $25,000 for a single incident of discrimination lasting 30 minutes that, as here, did not involve derogatory comments, threats, or assault); *cf.* Joshua F. Bowers, EEOC Awards of Emotional Distress Damages Exceeding $100,000, ALI-ABA Committee on Continuing Professional Education, Current Developments in Employment Law: The Obama Years at Mid-Term (July 28-30, 2011) (documenting emotional distress damages awards under Title VII of more than $200,000 in cases with comparable facts). For all of these reasons, we reject Hobby Lobby's argument based on comparison to other cases.

¶ 53      Hobby Lobby next argues that "the Commission failed to address causation," but this argument simply misstates the record. The Commission explicitly found that Sommerville's emotional distress was caused by Hobby Lobby's actions in denying her access to the women's bathroom at her workplace. Hobby Lobby then posits that Sommerville failed to show that its discriminatory treatment of her was the cause of her emotional distress. Again, this contention is refuted by the record. Sommerville testified amply about the direct emotional and physical repercussions of confronting daily the fact that Hobby Lobby would not let her use the same women's bathroom used by all other women employees and customers, and the ALJ found Sommerville's testimony credible. In light of the ample evidence in the record, the Commission did not abuse its discretion in finding that Sommerville's emotional distress was caused by Hobby Lobby's discriminatory treatment of her. See *MIFAB, Inc. v. Illinois Human Rights Comm'n*, 2020 IL App (1st) 181098, ¶ 76 (where evidence presented at damages hearing supported the Commission's award of emotional distress damages, reviewing court could not say that the Commission abused its discretion in that award).

¶ 54      Hobby Lobby's next argument is even more strongly contradicted by the record. Hobby Lobby disingenuously argues that the ALJ unfairly denied it the opportunity to present the

testimony of Annalee Miller, a human resources employee, at the damages hearing, but this simply is not so. The record discloses that Hobby Lobby *never* sought to call Miller to testify at the hearing. Rather, *Sommerville* initially placed Miller on her witness list for the hearing, and Hobby Lobby *objected* to her being called as a witness, asserting that she had no relevant or admissible evidence to offer. Accepting Hobby Lobby's assertion, the ALJ precluded Sommerville from presenting Miller's testimony. Because of this assertion, at the damages hearing when Hobby Lobby asked to make an "offer of proof" as to Miller's testimony if she had been called, the trial court denied Hobby Lobby's request.

¶ 55    The ALJ's refusal to entertain this unfair attempt by Hobby Lobby to make a record as to testimony that Hobby Lobby itself prevented Sommerville from obtaining was entirely proper. Hobby Lobby's assertion that Miller had no relevant or admissible testimony to offer estopped it from later arguing that it should be permitted to make an offer of proof as to that testimony. Hobby Lobby's further attempt to raise this issue on appeal is also barred. Where a party argues that a trial court should take a particular approach and the court adopts that position, the party cannot subsequently complain about the court's action. *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 10012, ¶ 33; *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004).

¶ 56    Hobby Lobby next argues that the Commission itself recognized that the emotional distress damages award was excessive, because the Commission remanded the ALJ's initial recommendation for further factual findings supporting the award. Once again, however, the record fails to support this contention. Although the Commission did remand on the issue of the damages award, it expressed no disapproval of the $220,000 amount recommended; rather, the Commission simply found that the factual findings were insufficient. Upon remand, the ALJ issued a supplemental recommendation in the same amount, containing a lengthy and detailed presentation of the evidence on damages and additional factual findings. After consideration of the exceptions filed by both parties, the Commission adopted the ALJ's recommendation. This sequence of events does not support the contention that the Commission itself believed the award to be excessive, given that it ultimately adopted that very award.

¶ 57    Hobby Lobby's final contention on the issue of damages is that it should not be "punished" by a large damages award for several reasons, including that it acted in good faith by interpreting the Act as permitting it to deny Sommerville access to the women's bathroom, that the issue was one of first impression in Illinois, that it thinks the statute is internally inconsistent, and that it faced "a difficult balancing" of Sommerville's needs and the "interests" of other employees. However, Hobby Lobby offers no legal authority suggesting that any of these are appropriate bases on which to reduce a damages award. (Indeed, some of its arguments are contradicted by applicable law. See, *e.g.*, *Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 490 (1996) (there is no good-faith exemption to the Act).) Thus, we find these arguments forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *E.R.H. Enterprises*, 2013 IL 115106, ¶ 56. Even if these arguments were not forfeited, however, the award here is compensatory, not punitive. The amount of the award is not based on some desire to punish Hobby Lobby but on the Commission's determination that Sommerville suffered substantial injury as a result of Hobby Lobby's continuing discriminatory treatment of her. The Commission did not abuse its discretion in its award of damages.

¶ 58     Before we leave the issue of damages, we note that Sommerville asks that, if we affirm the Commission's decision, we remand this case to the Commission for a determination of any additional damages and attorney fees that may be due. This approach is supported by the law, which allows complainants to seek additional damages for continuing violations. See *ISS International Service System, Inc. v. Illinois Human Rights Comm'n*, 272 Ill. App. 3d 969, 980-81 (1995) (section 8A-104(B) of the Act "requires the payment of actual damages for a complainant's injury [citation], and therefore the Commission would not be providing complete relief to complainants if it [did] not award additional damages warranted by" the continuing effects of discriminatory treatment). Accordingly, we enter such a remand.

¶ 59                                    III. CONCLUSION
¶ 60     For the reasons stated herein, we affirm the decision of the Commission and remand for further proceedings consistent with this opinion. Our October 30, 2019, stay is hereby vacated.

¶ 61     Commission decision affirmed and remanded.